IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**JOYCE A. FORTNER,**                      Case No. 3:15 CV 1217

    Plaintiff,                      Judge Jeffrey J. Helmick

    v.                      Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                      REPORT AND RECOMENDATION

## INTRODUCTION

Plaintiff Joyce A. Fortner ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b). (Non-document entry dated June 17, 2015). For the reasons below, the undersigned recommends the Court affirm the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB and SSI on June 26, 2012, alleging disability as of August 5, 2010, due to depression, anxiety, "people and color issues", mental issues, emotional issues, bipolar mania, and schizophrenia. (Tr. 102, 119). Plaintiff later amended her alleged onset date of disability to June 1, 2012. (Tr. 265). The claim was denied initially and on reconsideration. (Tr. 116, 133, 149, 165). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at an administrative hearing on February 4, 2014. (Tr. 56-101). Following

the hearing, an administrative law judge ("ALJ") issued an unfavorable decision finding Plaintiff not disabled. (Tr. 34-49). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4). Plaintiff filed the instant action on June 17, 2015. (Doc. 1).

## FACTUAL BACKGROUND

Personal and Vocational Background

Plaintiff was born on March 9, 1967, and was 46 years old on the administrative hearing date. (Tr. 68, 102). She has a twelfth grade education and past work experience as an appliance assembler. (Tr. 94-95, 116, 284).

Relevant Mental Medical Evidence[1]

Plaintiff was hospitalized from December 7, 2009, to December 11, 2009; admitting diagnoses included major depression (severe recurrent with questionable psychotic features), alcohol dependence in sustained remission, marijuana abuse, character disorder (not otherwise specified), and overdose of prescription medication. (Tr. 408). She was transferred to a mental health center after she was medically stabilized due to expressions of hopelessness and suicidal ideation. *Id.*

During her hospitalization, a mental status exam revealed a blunted affect; anxious mood; limited insight; fair judgment; impoverished associations; no clear-cut delusions or hallucinations, but some referential ideas; and she was oriented and in no acute distress, but disheveled-appearing. (Tr. 408-09). Psychological testing suggested the presence of depression

---

1. Plaintiff primarily focuses on medical evidence from 2012 to present, with the exception of a 2009 hospitalization. (Doc. 12, at 2). Because Plaintiff's alleged onset date of disability is June 1, 2012, the undersigned does the same.

and "overwhelming anxiety", but no obvious psychosis. (Tr. 408). Upon discharge, she was also diagnosed with schizoaffective depressed, rather than major depression. *Id.*

A treatment record from Bipin Desai, M.D., dated January 31, 2012, revealed Plaintiff was "feeling good", had no side effects from her medication, and was sleeping well with medication. (Tr. 452). She was studying criminal justice. *Id.* The progress note reveals she "weaned herself off" two medications. *Id.* A mental status examination revealed no serious mental status abnormalities and intact insight and judgment. *Id.* Her diagnoses were major depressive disorder (recurrent, in full remission) and cannabis abuse. *Id.* Dr. Dasai adjusted her prescription medication. *Id.*

Plaintiff had an appointment with Dr. Desai again on June 4, 2012, and she arrived with her mother. (Tr. 454). Plaintiff's mother reported she was paranoid, talking to herself, and had been "religiously preoccupied." *Id.* Plaintiff described no depressive symptoms, but she was guarded, minimally communicative, and anxious. *Id.* She exhibited slow and soft speech, a constricted affect, psychotic or borderline psychotic process, paranoia, poor insight into illness, fair social judgment, and behavior suggesting auditory hallucinations. *Id.* Dr. Dasai noted Plaintiff had no difficulty naming objects or repeating phrases, no suicidal or homicidal ideas or intentions, and normal vocabulary and fund of knowledge, indicative of normal cognitive functioning. *Id.* He continued her diagnoses of major depressive disorder and cannabis abuse, and continued prescription medication. *Id.*

Two days later, Plaintiff went to the emergency room complaining of psychiatric problems, including depression. (Tr. 457). She stated she was driving and could not remember what she was doing and became scared and paranoid with periods of crying, laughing, and lack of sleep. (Tr. 460). Her family reported she had been acting strangely and she was observed

talking to herself. (Tr. 460). She was admitted and remained in the hospital from June 6, 2012, to June 14, 2012. *Id.* Emergency room staff noted pertinent positives including depression, disjointed speech, difficulty with her thought process, and decreased sleep. *Id.* A mental status exam revealed she was adequately nourished and oriented, but disheveled. *Id.* She had a blunted affect, labile mood with some depression, paranoid ideation with delusional content, tangential associations, limited insight, poor judgment, and average intelligence. *Id.*

After admittance to psychiatric service, she began therapy and showed gradual improvement and was not quite as disorganized, but lacked insight and acceptance of her condition. *Id.* The attending physician, J.T. Spare, M.D., diagnosed Plaintiff with bipolar disorder (type 1 most recent episode manic with psychotic features), history of alcohol dependence in sustained remission, history of marijuana abuse, character disorder (avoidant and paranoid), and assigned a global assessment of functioning ("GAF") score of 15.[2] Upon discharge she was diagnosed with bipolar disorder (manic, psychotic features), history of alcohol in sustained remission, history of marijuana abuse, and character disorder, (avoidant and paranoid). (Tr. 460). She was instructed to take her prescribed psychiatric mediation and keep aftercare appointments as scheduled. (Tr. 461).

Plaintiff underwent an initial psychiatric assessment on June 27, 2012, with certified nurse practitioner ("CNP") Amy Perry. (Tr. 469). A mental status examination revealed a

---

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 11 and 20 indicates "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." *Id.* at 34.

4

depressed and flat, but hyper mood and affect; scattered thoughts marked by a flight of ideas; rapid speech; eye contact staring; poor judgment and insight; auditory and visual hallucinations; average intelligence; and delusional thoughts. *Id.* CNP Perry diagnosed Plaintiff with bipolar disorder with psychotic features, personality disorder (not otherwise specified), and assigned a GAF score of 45.[3]

At a counseling session on June 28, 2012, Plaintiff was "somewhat manic", and talkative with some flight of thoughts. (Tr. 470).

During a counseling session on July 11, 2012, CNP Perry noted Plaintiff was well-groomed and dressed, alert and oriented, more focused and organized, still paranoid but improving, brighter and calmer, and less restless. (Tr. 466). She had much slower speech and poor insight and judgment. *Id.* She denied suicidal and homicidal ideation. *Id.*

On July 12, 2012, a counselor noted Plaintiff had made "good progress". (Tr. 473). Her mood was calmer, but her thoughts were easily distracted and she jumped from one topic to another. (Tr. 472). Plaintiff's goals included stabilizing her mood, reducing impulsive behavior, reducing hallucinations, and work on her coping skills. *Id.* The record reveals she was very athletic, went swimming every day, and enjoyed golfing. *Id.*

Plaintiff attended a counseling session on July 30, 2012, and reported she stopped taking her prescription medication because of how it made her feel. (Tr. 465). Her mood and affect were "stable and bright"; she was well dressed and groomed, and denied hallucinations. *Id.* A CNP advised Plaintiff she needed to be on a mood stabilizer. *Id.*

---

3. A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *DSM-IV-TR* at 34.

On August 8, 2012, Plaintiff was admitted to the hospital after she went to the emergency room complaining of psychiatric problems. (Tr. 494). She was discharged seven days later on August 15, 2012. (Tr. 498-99). She had feelings of hopelessness and was "religiously preoccupied." (Tr. 498). Doctors noted she experienced an acute psychotic break, depression, and drug withdrawal. (Tr. 496). It was noted that the psychosis was secondary to noncompliance. *Id.* The emergency room record reveals she was psychotic, agitated, and disorganized. (Tr. 498).

A mental status exam revealed she was disheveled in appearance, guarded, not very communicative, appeared to be actively hallucinating, had a depressed mood, blunted affect, was oriented, and had limited insight and judgment. (Tr. 501). She denied suicidal or homicidal thoughts. *Id.* She was assigned a GAF score of 15.[4] A toxicology screen was negative. *Id.* Upon discharge on August 15, 2012, she was diagnosed with bipolar disorder (mixed with psychotic features), polysubstance dependence (marijuana and alcohol), and migraine headaches. (Tr. 498).

Plaintiff had an appointment with Dr. Spare on August 21, 2012. (Tr. 549). She had a blunted affect, an anxious mood, tangential associations, limited insight, and poor judgment. *Id.* "She remained preoccupied with getting Social Security Disability." *Id.* She was oriented to place, person, and time. *Id.* He assigned a GAF score of 35.[5]

Plaintiff continued attending counseling sessions. At an August 23, 2012, counseling session, Plaintiff was "moody" and manic. (Tr. 546). On September 6, 2012, the counselor noted she was slightly fidgety with slightly rapid speech, poor memory, and poor insight and judgment.

---

4. *DSM-IV-TR*, *supra* note 2.
5. A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing in school. *Id.*

(Tr. 542). She had coherent and circumstantial thoughts, denied hallucinations, and no delusions or paranoia were expressed or observed. *Id.* Plaintiff was looking forward to attending a festival, and stated she enjoyed drinking a few beers and meeting people at bars. (Tr. 543). She "minimized the abuse" when asked about mixing alcohol with her medication, and skipped her evening dosage when she consumed alcohol so that her medication would not interfere. *Id.* The counselor encouraged her to work toward sobriety. *Id.*

In September 2012, the counselor noted Plaintiff's thoughts were "pretty scattered", but she continued to do well on medication. (Tr. 538-39). She was sleeping well and staying busy. (Tr. 538). Plaintiff was well-groomed with good hygiene, displayed good eye contact with no abnormal movements, friendly demeanor with rapid speech, coherent thought content, bright affect, alert and oriented with fair memory, denied hallucinations, and no delusions were observed. *Id.* She had poor judgment and insight and below-average intellect, but otherwise normal mental status findings. *Id.* She kept herself occupied by reading, drawing pictures, and attempting to get a gym membership. (Tr. 539). Because Plaintiff was functioning well, the counseling sessions were decreased to once every three weeks. (Tr. 539-40).

At a counseling session on October 19, 2012, Plaintiff's mental status examination was normal, with the exception of fair insight and judgment. (Tr. 534). She expressed disappointment over being denied disability benefits. (Tr. 534-35). Plaintiff continued to take her medication and expressed knowledge that her mood declined rapidly when noncompliant with her prescription medications. *Id.* She also stated she felt less angry since a recent medication increase. (Tr. 535). She indicated she would seek follow-up care with Dr. Desai. (Tr. 529, 534, 536). A counseling progress noted dated November 1, 2012, revealed Plaintiff reported she was going through a depressive period. (Tr. 531-32).

Plaintiff was admitted to the hospital from November 4, 2012, to November 8, 2012. (Tr. 503-10). She arrived at the emergency room complaining of severe depression characterized by sleep disturbance, inability to eat, and intensifying negative preoccupations. (Tr. 507). She had a lack of interest in activities she once enjoyed and reported sleeping twelve to fourteen hours a night. (Tr. 503). A mental status exam revealed she was adequately nourished, disheveled, and oriented to time, place, and person. (Tr. 507). She had a blunted affect, anxious mood, impoverished associations, limited insight, poor judgment, denied hallucinations or paranoia, but stated she felt depressed and hopeless. *Id.* Dr. Spare assigned her a GAF score of 15.[6] (Tr. 510). Upon discharge she was diagnosed with bipolar disorder, polysubstance abuse in remission, and mixed character disorder. (Tr. 507).

Plaintiff had an appointment with Dr. Desai on November 19, 2012. (Tr. 511-12). She reported she was "feeling better" and denied any manic symptoms, hallucinations, or substance abuse. *Id.* A mental status examination was unremarkable, with the exception of fair insight and judgment. *Id.* Dr. Desai diagnosed her with moderate bipolar disorder, depression, and cannabis abuse. *Id.*

On December 4, 2012, Plaintiff had an appointment with Dr. Desai and reported she was depressed and sleeping poorly at night. (Tr. 524-25). She denied manic symptoms, hallucinations, delusions, or other symptoms of psychotic process. (Tr. 524). She denied recent substance use and reported compliance with prescription medication. *Id.* Dr. Desai diagnosed her with bipolar disorder and cannabis abuse. *Id.* Mental status findings were generally normal,

---

6. *DSM-IV-TR*, *supra* note 2.

except that Plaintiff appeared anxious with slow and soft speech, and with signs of moderate depression. *Id.* He assigned a GAF score of 70.[7]

At a February 4, 2012, appointment with Dr. Desai, Plaintiff reported she was feeling better. (Tr. 522). She described no depressive symptoms, hallucinations, delusions, or other symptoms of psychotic process. *Id.* She denied substance use and reported taking her medication regularly. *Id.* Plaintiff was friendly, fully communicative, and casually groomed. *Id.* She had normal speech, intact language skills, improved mood and affect, intact associations, logical thinking, appropriate thought content, intact and appropriate cognitive functioning and fund of knowledge, intact short and long term memory, normal cognitive functioning, and fair insight and judgment. *Id.* She was fully oriented and denied homicidal ideas or intentions. *Id.* Dr. Desai assessed a GAF score of 70.[8] *Id.*

Over the next two months, Dr. Desai's mental status findings remained consistent with the February 2013 results; Plaintiff reported she felt "pretty good" and denied prescription medication side effects. (Tr. 518, 520). She also had consistent GAF scores of 70. *Id.*

A counseling progress note dated July 16, 2013, reveals Plaintiff's euthymic mood and affect and that she enjoyed her time in Florida with her mother and sister. (Tr. 552). She was looking forward to becoming a grandmother. *Id.* The counselor assessed a GAF score of 70.[9] *Id.*

On September 16, 2013, Plaintiff had an appointment with Dr. Desai and reported being depressed and experiencing panic attacks. (Tr. 556). He noted she appeared anxious with signs of moderate depression, sad demeanor, and depressed thought content and mood. *Id.* The remaining

---

7. A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning, (e.g., occasional truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships."
8. *DSM-IV-TR*, *supra* note 7.
9. *DSM-IV-TR*, *supra* note 7.

findings of the mental status examination were consistent with prior findings and Dr. Desai again assessed a GAF score of 70.[10] *Id.*

The following day Plaintiff reported to a counselor that she continued to experience anxiety and panic attacks, particularly when in large stores. (Tr. 551). She was happy and proud about becoming a grandmother. *Id.* The counselor noted Plaintiff was "quite dependent" on her mother and noted she would continue to meet with Plaintiff every one and a half months to work on anxiety. *Id.* She again assessed a GAF score of 70.[11] *Id.*

On October 14, 2013, Plaintiff reported to Dr. Desai that she was depressed and having difficulty sleeping at night. (Tr. 571). Her panic attacks had decreased, she denied any side effects to her medication, and she was not suicidal. *Id.* Plaintiff described no symptoms of mania, no hallucinations, delusions, or other symptoms of psychotic process. *Id.* Dr. Desai noted she presented as friendly and fully communicative, but anxious. *Id.* She had normal and coherent speech, intact language skills, moderate signs of depression, a sad demeanor, depressed thought content and mood, intact associations, logical thinking, appropriate thought content, normal vocabulary and fund of knowledge, and fair insight and judgment. *Id.*

At appointments with Dr. Desai and a counselor in November and December 2013 and January 2014, Plaintiff appeared anxious, but had otherwise normal mental status examination results. (Tr. 563, 567, 582). On January 14, 2014, a counselor noted Dr. Desai corrected Plaintiff's listed diagnoses because her cannabis abuse had been resolved. (Tr. 581).

---

10. *DSM-IV-TR*, *supra* note 7.
11. *DSM-IV-TR*, *supra* note 7.

Opinion Evidence

On June 4, 2012, Dr. Desai completed a mental functional capacity assessment. (Tr. 455). He indicated moderate or marked limitation in every area and determined Plaintiff was, therefore, unemployable. *Id.*

On April 11, 2013, Dr. Desai completed a mental impairment questionnaire. (Tr. 513-15). He listed her diagnoses as bipolar I depressed with psychotic features, paranoid personality traits, and assigned a GAF score of 55.[12] (Tr. 514). Dr. Desai determined she would be absent from work more than four days a month and her prognosis was "guarded to poor". *Id.* He added Plaintiff was not a malingerer. (Tr. 516). He opined she had moderate, marked, or extreme limitations in all areas of work activity.[13] (Tr. 515).

*State Agency Reviewers*

On August 28, 2012, state agency reviewer Tonnie Hoyle, Psy.D., considered listings 12.03, 12.04, and 12.09, but ultimately determined Plaintiff's medically determinable impairment did "not precisely satisfy the diagnostic criteria" for any. (Tr. 111, 128). In regard to "B" criteria of the listings, Dr. Hoyle noted Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two repeated episodes of

_____

12. A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.*, at 34.

13. According to the mental residual functional capacities form Dr. Desai completed, a moderate impairment is one that does not prevent employment, but may interfere with the effectiveness, efficiency, and productivity of employment up to one-third of the time on a recurring basis in an eight-hour workday. A marked level of impairment is one that significantly impedes useful functioning and productivity in a work setting. A marked impairment is one where required work effectiveness, efficiency, and productivity is diminished at least fifty percent of the time on a consistent basis in an eight-hour workday. An extreme limitation is one that is not compatible with effective, efficient, productive work activity. The negative manifestations of this limitation would be present and exhibited throughout an eight-hour workday.

decompensation, each of extended duration. *Id.* Dr. Hoyle determined the evidence did not establish the presence of the "C" criteria. *Id.*

Dr. Hoyle also made a determination regarding Plaintiff's residual functional capacity. (Tr. 113, 130). She determined Plaintiff was moderately limited in the following areas: ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; ability to respond appropriately to changes in the work setting; but was "not significantly limited" in a majority of areas. (Tr. 113-14, 130-31).

On reconsideration, a second state agency reviewer, Katherine Fernandez, Psy.D., concurred with these determinations. (Tr. 142-48, 159-64).

<u>Hearing Testimony</u>

Plaintiff testified she sometimes experienced panic attacks at the grocery store and she would need to go wait in the car while her mother finished the shopping. (Tr. 67). She experienced this in large and busy stores. (Tr. 68). Her panic attacks consisted of a rapid heart rate, shallow breathing, and shaking. (Tr. 67). She took classes at a technical college in 2011 through 2012, but dropped out due to panic attacks. (Tr. 69, 74-75). She was able to drive, including a trip to Florida, stay in Florida for a month and half visiting family, and make monthly trips to visit her daughter and granddaughter. (Tr. 69, 71, 72).

She testified was terminated from a job in 2012 because she experienced panic attacks, yelled at people, and shook. (Tr. 75). Prior to 2012, she worked at Whirlpool for fourteen years. (Tr. 76). She stated she was terminated from Whirlpool "for not wearing sleeves", but speculated

it was due to her frequent medical leave and time off for depression and panic attacks. (Tr. 78-80). She stated she had difficulty sleeping and her medication made her sleep for twelve to fourteen hours a night. (Tr. 81-82). She experienced no other side effects from her medication. (Tr. 83-84).

She spent a typical day staring out the window and did not watch television frequently because it bothered her, but also stated she enjoyed watching a particular television show. (Tr. 84-85). She also experienced crying spells. (Tr. 85).

She also addressed three instances in 2012 which culminated in hospitalizations. *Id.* Prior to the hospitalizations, she could not sleep and tried to rearrange her whole house. *Id.* Her mother had to relay what took place because she did not recall the incidents. *Id.* She stated medical staff adjusted her medication each hospital stay and, as of the hearing date, she had not been hospitalized in over a year. (Tr. 86). She lost her home and car due to depression and panic attacks. (Tr. 87). She had difficulty taking showers due to low motivations and stated she had no hobbies or interests. (Tr. 89-90).

The VE testified that a hypothetical individual similarly situated to Plaintiff with the following limitations would not be able to perform her past relevant work: could understand, carry out, and remember simple and detailed instruction; make judgments on simple work; respond appropriately to usual work situations and changes in a routine work setting that was repetitive from day-to-day with few unexpected changes; respond appropriately to occasional supervision, but no high pressured or over the shoulder supervision; occasional superficial interaction with co-workers and the public on trivial matters, defined as dispensing and sharing factual information not likely to generate an adversarial setting. (Tr. 95). The VE found this

hypothetical individual would be able to perform other work in our national economy, even with an additional work limitation of avoidance of large crowds. (Tr. 96-97).

Plaintiff's counsel also presented the VE with hypothetical questions. (Tr. 97-99). The VE opined if the hypothetical individual was absent from work for four days a month, competitive employment would be precluded. (Tr. 97). The VE also determined that if the hypothetical individual had difficulty in the following areas for more than one third of the workday, she would be precluded from competitive employment: ability to complete a normal workday or workweek without interruptions; ability to maintain attention and concentration for extended periods; and ability to perform activities within a schedule and maintain regular attendance. (Tr. 98).

ALJ Decision

On February 20, 2014, the ALJ made the following findings of fact and conclusions of law:

1. Plaintiff met the insured status requirements of the Social Security Act through March 31, 2016.

2. Plaintiff had not engaged in substantial gainful activity since her amended alleged onset date of June 1, 2012.

3. Plaintiff had the following severe impairments: a bipolar disorder with psychotic features; a depressive disorder; a borderline personality disorder; a schizoaffective disorder; and a polysubstance abuse disorder, in remission.

4. Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: Plaintiff could understand, carry out, and remember simple and detailed instructions and make judgments on simple work. She could respond appropriately to usual work situations and changes in a routine work setting that was repetitive from day-to-day with few and expected changes. She could respond appropriately to occasional supervision, but no

14

high-pressured or over the shoulder supervision. Plaintiff could have occasional superficial interaction with coworkers and the public on trivial matters, defined as dispensing and sharing factual information not likely to generate an adversarial setting. Further, Plaintiff would be limited to work that did not involve being in large crowds, such as a grocery store or department store, during business hours.

6. Plaintiff was unable to perform any past relevant work.

7. Plaintiff was born on March 9, 1967, and was 43 years old, defined as a younger individual age 18-49, on the alleged disability onset date.

8. Plaintiff had at least a high school education and was able to communicate in English.

9. Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Plaintiff was "not disabled", whether or not she had transferable job skills.

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

11. Plaintiff had not been under a disability, as defined in the Social Security Act, from August 5, 2010, through the date of this decision.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court

cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for disability benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's RFC and can claimant perform past relevant work?

5.    Can claimant do any other work considering her RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration

requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ erred (1) by failing to consider the degree to which Plaintiff's medication noncompliance may have been related to, or caused by, her mental health impairment, and (2) in considering and assigning weight to the opinions of the state agency psychological consultants. (Doc. 12, at 11-15).

<u>Medication Noncompliance</u>

Plaintiff first alleges that ALJ should have considered that her mental impairment could have caused her noncompliance. She points to a Sixth Circuit case that references Eighth Circuit precedent. (Doc. 12, at 11-13). In *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009), the Sixth Circuit stated that "[f]or some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." Plaintiff brings to the Court's attention the parenthetical following that sentence in which the court cited *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009), and cited to a collection of cases "recognizing that a mentally ill person's noncompliance with treatment 'can be . . . the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse.'" *White*, 572 F.3d at 283. The court in *White* noted, however, that the plaintiff failed to seek treatment for six months and concluded "[a 'reasonable mind' might therefore find that the lack of treatment . . . indicated an alleviation of [her] symptoms." *Id.* at 284. Additionally, the Eighth Circuit later clarified that there must be some evidence expressly linking the mental illness to the noncompliance. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010).

17

Plaintiff also alleges that a case from this Court supports her argument. (Doc. 12, at 12-13); *see Burge v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 180376 (N.D. Ohio). In *Burge*, the court found that a severe mental impairment can excuse medication noncompliance in limited circumstances similar to those required in the Eighth Circuit. *Id.* at *9. Specifically, it held that "to establish a severe mental impairment as an acceptable reason excusing a claimant's adherence to a medical regimen including prescription psychiatric medications, the record must contain evidence expressly linking noncompliance with the severe mental impairment." *Id.*

However, *Burge* does not support Plaintiff's position because she admits there is no direct evidence linking the impairment and noncompliance in this case. Instead, she asks the Court to speculate that observed disturbances in her thought processes may have contributed to her noncompliance. (Doc. 12, at 12).

Plaintiff also asserts that *Burge* supports the proposition that the ALJ should have investigated this matter further through referral to a consultative examiner or utilization of a medical expert. (Doc. 12, at 12-13). In *Burge*, the court stated:

> Although a referral for a consulting examination and the calling of a medical expert remain within the discretion of the ALJ, a serious argument can be made under certain circumstances that refusal to obtain a further opinion constitutes reversible error given the Sixth Circuit's admonishment in *White* that "a mentally ill person's noncompliance with treatment 'can be ... a result of the mental impairment itself and, therefore, neither willful nor without justifiable excuse'...." Further, a claimant may strengthen the case for a reversal by raising the denial of a request for a consulting examination or a medical expert before the Appeals Council, but the failure to raise that issue in a request for review by the Appeals Council does not constitute a waiver thereof for purposes of judicial review.

*Burge*, 2013 U.S. Dist. LEXIS 180376, at *10.

The undersigned does not think this is the limited circumstance to which *Burge* speaks. Plaintiff presents no evidence linking her mental impairments to her noncompliance. Also, while

not dispositive, Plaintiff does not assert that she raised the denial of a request for a consulting examination or medical expert before the Appeals Council.

Further, in *Smith v. Astrue* the court emphasized that the *White* decision did not "establish[] a *per se* rule that the existence of any mental impairment(s) constitutes an 'acceptable reason' for failing to follow prescribed treatment under 20 C.F.R. § 416.930(c)." 2012 U.S. Dist. LEXIS 178670, at *3 (N.D. Ohio). As such, Plaintiff has not met her burden to show the ALJ erred by failing to consider her medication noncompliance was the result of her mental impairment.

Additionally, Plaintiff presents no clear evidence that the ALJ conclusively did not consider that possibility. The ALJ is not required to delineate every consideration that went into his decision, which the undersigned finds is supported by substantial evidence. The ALJ found that Plaintiff's mental health conditions were well-controlled when in treatment and compliant with medication, which is supported by the record. (Tr. 44, 511, 518, 520, 522, 524, 556, 558, 567, 569). Plaintiff's hospitalizations followed periods in which she was noncompliant with her medication and abusing drugs and alcohol. (Tr. 110, 452, 461, 481-82, 484, 489, 498-99, 543). Also, following her final hospitalization in November 2012, Dr. Desai noted Plaintiff's compliance with medication and that her mental status findings were quite mild; he consistently assigned a GAF score of 70. (Tr. 511, 518, 520, 522, 524, 556, 558, 567, 569). The ALJ also correctly noted that throughout the relevant period Plaintiff drove a car, traveled on extended trips, cared for personal needs, left her home unaccompanied, prepared her own meals, read, drew, and enjoyed swimming and golfing. (Tr. 69, 70, 71, 312, 315, 538-39).

Plaintiff also briefly suggests that the ALJ's alleged error with regard to her noncompliance somehow affected his determination that Plaintiff did not meet Listing 12.04(C)

because she did not have the required episodes of decompensation. (Doc. 12, at 13). This argument fails on its face. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(C)(4) ("The term repeated episodes of decompensation, each of extended duration . . . means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.").

Plaintiff does not argue to this Court that she meets Listing 12.00(C)(4) and the record reveals that none of her hospital stays lasted for at least two weeks. Further, at the hearing the ALJ inquired into whether Plaintiff's hospital stays lasted for fourteen days, and Plaintiff's counsel responded that the three hospital stays in combination would qualify as an episode of decompensation. (Tr. 64). Therefore, Plaintiff has not shown that she had repeated episodes of decompensation, much less met her burden to prove that her mental impairment met or equaled a listing. A determination that her noncompliance was somehow related to her mental impairment would not change this fact. Therefore, the ALJ did not error by allegedly failing to consider that Plaintiff's noncompliance was the result of her mental impairment.

State Agency Reviewers

Plaintiff next argues that the ALJ's determination that Plaintiff had no episodes of decompensation is inconsistent with the state agency reviewers findings of "one or two episodes of decompensation", the opinions of which he gave great weight. (Doc. 12, at 13-15). Plaintiff alleges that these one or two episodes in combination with Plaintiff's November 2012 hospitalization, of which Plaintiff alleges the state agents were unaware, would have satisfied the "B criteria" of the mental disorder. (Doc. 12, at 14-15).

Under the regulations, there exists a hierarchy of medical opinions: first, is a treating source; second, is non-treating sources, which are those medical sources who have examined but not treated the Plaintiff; and lastly, is a non-examining source, those who render opinions based

on a review of the medical record as a whole. 20 C.F.R. § 416.902. An ALJ must provide "good reasons" for the weight given to a treating source, *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 391 (6th Cir. 2004), but this is not so if a non-treating or non-examining source is involved. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (holding "the SSA requires ALJs to give reasons for only *treating* source" opinions) (emphasis in original); *Murry v. Comm'r of Soc. Sec.*, 2013 WL 5428734, at *4 (finding "[n]otably, the procedural 'good reasons' requirement does not apply to non-treating physicians.").

The ALJ did not err in considering and assigning weight to the opinions of the state agency reviewers, and substantial evidence supports his determination. As an initial matter, contrary to Plaintiff's assertion, it appears as the though the second state agent, Dr. Fernandez, was aware of the November 2012 hospitalization when she made the determination Plaintiff suffered from one or two episodes of decompensation. (Tr. 137-38, 144). The record reveals this information was before her when she made that determination and she referenced a progress note dated November 19, 2012, and stated Plaintiff had "recently been discharged from the MHU". *Id.* Because it appears this information was not only before her, but that she also considered it, Plaintiff's claim is refuted.

"[A]n ALJ is not required to discuss every piece of medical opinion evidence", so long as enough is discussed to enable reviewing courts to determine whether substantial evidence supports the decision. *Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 753 (6th Cir. 2011). "Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (internal citation omitted); *see also Baranich v. Barnhart*, 128 F. App'x 481, 488–89 (6th Cir. 2005).

21

Substantial evidence supports the ALJ's findings that Plaintiff's impairments did not meet a listing. The question on review is not whether substantial evidence could support another conclusion, but rather whether substantial evidence supports the conclusion reached by the ALJ. *Jones,* 336 F.3d at 477.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision supported by substantial evidence and reached with the correct legal standards. The undersigned recommends the Court affirm the Commissioner's decision denying benefits.

s/James R. Knepp, II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).